UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HOLLIS LOCKETT,<br><br>    PETITIONER,<br><br>v.<br><br>DAVID L. WINN,<br><br>    RESPONDENT. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 04-40124-MLW<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF SANDRA L. HOWARD, M.D., CLINICAL DIRECTOR

I, SANDRA L. HOWARD, hereby declare and state as follows:

1. I have been employed by the United States Department of Justice, Federal Bureau of Prisons ("BOP") since January, 1995, and have been the Clinical Director, at the Federal Medical Center ("FMC Devens"), Devens, Massachusetts since February 25, 2001.

2. As the Clinical Director, I oversee the medical care provided to inmates incarcerated at FMC Devens. This includes approximate sixty (60) inmates receiving kidney dialysis. In this capacity, I have access to records maintained in the ordinary course of business at FMC Devens. I am familiar with inmate Hollis Lockett ("Lockett"), Register Number 84182-020, the plaintiff in the above-captioned civil action. I have been advised that Lockett is refiling his Petition for Writ of Habeas Corpus, alleging that the BOP is violating our renal transplant policy. As relief, he is requesting that this Court order the BOP to give him a renal transplant.

3. On February 11, 2000, BOP amended Program Statement 6000.05, Health Services Manual, Chapter VI, § 21, to permit its clinical staff to consider organ transplantation as a treatment option for inmates under certain prescribed circumstances. Under the Program Statement, when the Clinical Director at a BOP institution determines it is medically necessary to evaluate an inmate's suitability for an organ transplant, he or she will initiate an organ transplant laboratory/specialist consultant work-up at the institution.

Once a specialist determines that an inmate may be a potential candidate for organ transplantation, and the Clinical Director recommends that further evaluation is medically appropriate, the inmate will be evaluated at an appropriate facility such as a transplant center in the vicinity of the institution or a BOP Medical Referral Center. If an organ transplant center considers an inmate suitable for a transplant, the institution's Clinical Director will then refer all pertinent medical, surgical and psychiatric documentation to the Medical Director of the BOP for consideration. If the Medical Director determines that organ transplantation is medically indicated, the inmate will be referred to an appropriate transplant center in accordance with Bureau policy, transplant center regulations, and state and federal laws. Prior to any transplant center referral, the Medical Director must first obtain the concurrence of the Assistant Director, Correctional Programs Division, to ensure that all security issues or correctional interests regarding referral of the inmate have been satisfied.

A. Summary of Lockett's Medical Care Regarding Kidney Transplant Eligibility

4. The factual information set forth in this declaration is obtained from (and summarizes) relevant pages from Inmate Lockett's medical records maintained by FMC Devens. Inmate Lockett's current treating physician is Dr. Alcia Williams.

5. Pursuant to Program Statement 6000.05, Health Services Manual, as detailed above, on October 15, 2003, I referred inmate Lockett's medical, surgical and psychiatric documentation to the Medical Director of the BOP for elective kidney transplant consideration. The same packet was also forwarded to the transplant team at the University of Massachusetts ("UMASS") for the same consideration. On December 16, 2003, this documentation was evaluated by the Organ Transplant Committee at the BOP's Central Office. The Organ Transplant Committee Finding and Report was provided to FMC Devens in a memorandum from the BOP Medical Director on or about January 6, 2004.

6. In the January 6, 2004 Report, Lockett's referral was not approved by the Medical Director, as the Organ Transplant Committee concluded that inmate Lockett had several medical and psycho-behavioral contraindications to renal transplantation which required further evaluation. The Medical Director made the following recommendations prior to inmate Lockett being re-considered for a kidney transplant:

    a) A CT scan of the chest be done to exclude a small aortic aneurism and to re-check the mediastinal density.

    b) Lockett's PTH was elevated as noted in the nephrologist note dated October 1, 2003. This needed further evaluation before proceeding with

        the transplant center evaluation[1].

    c)     Address Lockett's obesity which poses an increased surgical risk[2].

    d)     Contact Lockett's family members to identify potential donors and arrange for compatibility testing[3].

    e)     Re-submit the transplant request once the above-issues have been addressed and a living-related donor is identified.

Also, in addition to Lockett having several medical contraindications, the Medical Director noted in his summary that Lockett's "case management and psychological assessments revealed minor incident reports, refusal to accept responsibility for his crime, refusal to participate in the financial responsibility program, and difficulty complying with dietary recommendations."[4] It was also noted, that the psychology assessment did not identify an Axis I or Axis II diagnosis.

7.     In accordance with the aforementioned recommendations made by the BOP's Medical Director for renal transplant approval, FMC Devens has addressed the following:

    a)     Prior to (and after) the aforementioned recommendation, CT scans have been performed on Lockett. For example, a chest CT scan was done on November 13, 2003, and did not identify any aortic aneurism or mediastinal density.

---

[1] PTH controls the level of calcium in the blood in two different ways. It supports the role of vitamin D to allow the stomach and digestive tract to absorb calcium, or it regulates the amount of calcium being added to and subtracted from the bones. The PTH level is significant in that, in some dialysis patients, the para-thyroid gland does not return to normal after transplantation, which can cause decreased calcium to the bones, leading to an increased risk of fractures. Additionally, an increased PTH level can cause deposits of calcium in arteries, including the heart. A normal PTH level in a dialysis patient is between 100 - 200. The goal is to suppress the gland to that level regardless of the transplantation potential. Any increased level of PTH enhances the risks associated with the para-thyroid gland function in post-transplantation.

[2] The weight of the patient is also a factor considered by a transplantation team because obesity increases the risks of wound infection and other complications during and after transplantation.

[3] This requirement is important because by BOP policy the primary transplantation program is a voluntary, family, living donor program.

[4] The transplant recipient has to demonstrate they are compliant with treatment and medications.

        Additionally, a second chest CT scan was done on January 6, 2004, at the request of the pulmonologist, as well as a third on April 8, 2004, and a fourth, on July 12, 2004.

b)     On October 1, 2003, the nephrology indicated an elevated PTH. A repeat PTH level was checked on December 3, 2003, and showed minor improvement at 430, however, another PTH level check was completed on February 6, 2004, and showed further fluctuation at 544. The PTH level is checked regularly as part of a normal monthly blood screening. As of September 1, 2004, his PTH level was at 427, markedly improving consistent with diet and medication compliance.

c)     As noted previously, there was concern regarding Lockett's obesity. Since his arrival at FMC Devens, Lockett has maintained an excess weight between 229.9 lbs and 240 lbs, despite recommendations for diet and exercise changes. He has met with the FMC Devens dietitian on a monthly or bi-monthly basis since March 2000. Mr. Lockett's lab work shows that he has a chronically high Calcium level, despite using Renagel's rather than a calcium containing phosphorus binder. He also gains 2-4 kg more of fluid between treatments than is recommended. Inmate Lockett has not taken advantage of the exercise options available or the dietary education he has received. He continues to be monitored by and have follow up with the FMC Devens dietician.

d)     Recommended telephone contact with the family members who may be potential kidney donors for compatibility testing has occurred. Inmate Lockett met with the FMC Devens Social Worker on Oct 1, 2003 and Oct 6, 2003, to identify and contact potential family kidney donors. Six family members were identified as potential donors. This list was forwarded to the Medical Director of the BOP, as well as the UMASS Transplant Team.

e)     The above medical issues have all been addressed. BOP then followed the Medical Director's recommendation to resubmit a request for transplantation. The Central Office response also notes that there are some negative contraindications regarding Inmate Lockett's behavior, including receiving incident reports, refusing to participate in the financial responsibility program, and difficulty complying with dietary recommendations. It is important to note, however, that if all the medical issues and a donor are in place, these behavioral issues would not prevent the BOP from its approval and from referring him for a renal transplantation, but these may be factors the transplant team considers in determining whether he may be an ideal candidate.

8.     After submitting his documentation, a number of recommendations were made about inmate Lockett's current medical condition that needed to be addressed before a transplant could be approved. The BOP completed these recommendations at FMC

Devens. Once these issues were appropriately reviewed, approval was obtained through the BOP's Central Office for transplant consideration. Inmate Lockett has been approved by the BOP to be evaluated for a kidney transplant by the UMASS Kidney Transplant Department, and he remains a candidate for kidney transplantation while serving his federal sentence in the custody of the BOP. Based upon his last evaluation with the UMASS Transplant Team in September, 2004, a follow up evaluation will be held within nine months thereof, as per UMASS' request. Additionally, in response to Lockett's complaints and to rule out any active tumor or cancer diagnosis which would prevent pursuit of a transplant (transplants are not available to individuals with active cancer), the BOP pursued multi-disciplinary specialty follow ups and CT scans as directed by the Specialists with regard to Inmate Lockett's chronic cough. While pursuing this cough issue, a lung nodule was also identified, which required multiple CT scan testing and specialty evaluations.

B. <u>In-Depth Analysis of Medical Care Regarding Plaintiff's Transplant Eligibility</u>

The following is an in-depth analysis of the medical care Lockett has received at FMC Devens for purposes of his eligibility for a kidney transplant, which belies his claim of lack of care:

9.  Inmate Lockett arrived at FMC Devens on March 7, 2000 with the diagnoses:

    a) End-stage Renal Disease on Hemodialysis;
    b) Hypertension;
    c) Obesity;
    d) Hyperparathyroidism.

10. Currently, Lockett is being treated at FMC Devens for the above mentioned medical conditions, as well as Allergic Rhinitis/Bronchitis.

11. On January 11, 2002, Lockett was seen in the office of a local vascular surgeon to have his hemodialysis access evaluated. A duplex ultrasound was done in the office revealing a single point of stenosis which was believed to be amenable to percutaneous angioplasty.

12. In this regard, on February 1, 2002, angioplasty was successfully accomplished by an outside vascular surgeon. Inmate Lockett was followed up by the vascular surgeon post-operatively on March 1, 2002. At that time, the vascular surgeon stated that this corrected fistula could be used at least until his transonics (measures the flow of blood through the fistula) diminish, at which time he would be re-evaluated. Until that time, no further evaluation was considered to be necessary.

13. From February 13, 2002 through July of 2003, Lockett was seen on a monthly basis, primarily for his complaints of chronic cough. Several tests were conducted, including a

barium swallow, that revealed no reflux, or penetration and revealed a normal esophagus.

14. The contract nephrologist saw Lockett on May 9, 2003 for a follow-up visit. His condition remained stable, and Dialyvite (a vitamin for dialysis patients) was renewed.

15. On May 13, 2003, Lockett was evaluated by an Ear Nose and Throat (ENT) Specialist at UMASS for complaint of increased phlegm and cough production. He noted that the barium swallow was normal and that the head and neck examination was also normal. He recommended hydration, a pulmonary consultation, and a return as needed.

16. On August 28, 2003, Lockett was referred to an outside Pulmonary Specialist who performed a physical exam and reviewed the laboratory testing and ear, nose, and throat (ENT) consultation. The Pulmonary Specialist diagnosed inmate Lockett with allergic bronchitis. During the visit, a chest x-ray was performed. The x-ray revealed on lateral view, anterior to the trachea, a prominent 1.5 cm in diameter ill-defined density mass seen near the ascending aorta. On the same day, the Pulmonary Specialist was notified of the results of the chest x-ray.

17. On October 1, 2003, Lockett was seen by the contract nephrologist (kidney specialist). His parathyroid hormone (PTH) level was measured at 476.0, with the normal range being 10 to 69. He was evaluated for a potential kidney transplant. The nephrologist concluded that inmate Lockett may be a good candidate with better control of his PTH level.

18. Thereafter, Lockett met with a Social Worker at FMC Devens on October 1, 2003. They discussed the appropriate steps for him to follow in order to seek a transplant. The Social Worker encouraged Lockett to speak with his family members about being potential donors. They also discussed Lockett's need to follow his current and post-operative treatment plans in the event of a transplant.

19. On October 7, 2003, Lockett was seen in the Pulmonary Clinic at the UMASS Memorial Medical Center for follow-up. The Pulmonary Specialist reported that Lockett's pulmonary function testing was normal, and that the chest x-ray that was performed on August 28, 2003 had some pre-tracheal mass or fullness. His recommendations were as follows: Bromfed PD(anti-histamine); Flonase(antihistamine); Aciphex(for gastric reflux); CT scan of the chest; and a diet minimizing fats, chocolate, mints, caffeine, acid juices, and fruits.

20. On November 13, 2003, Lockett underwent a CT scan at the UMASS Memorial Medical Center. The diagnosis of the Radiologist was as follows: 1. Minimal patchy infiltrate in the right lower lobe. 2. Question slightly enlarged lymph node with central low density in the right paraesophageal region, consistent with findings of the chest x-ray.

21. On December 2, 2003, Lockett was seen by the Pulmonary Specialist for follow-up consultation in the lung and allergy center at the UMASS Memorial Medical Center. The Pulmonary Specialist was concerned that the Bromfed PD tablets and the nasal allergy spray were not started. He did not recognize that the Flunisolide (seasonal/perennial allergic rhinitis) allergy spray had been started back in September 2003. He commented on the CT scan of the chest showing "question paraesophageal lymphadenopathy versus mass." A repeat CT scan of the chest was ordered to be done in March 2004.

22. On January 6, 2004, Inmate Lockett went to UMASS Radiology for a follow up CT scan of his chest. Results for that CT scan indicated no change in findings compared to the November 2003 CT scan.

23. On February 10, 2004, Lockett went to UMASS to see a thoracic surgeon. It was noted at that time there was no interval change in the comparison of the November and January CT scans. He recommended a follow up CT within six months.

24. On February 17, 2004, Lockett went to UMASS for a follow up visit with a pulmonologist. It was noted that the abnormalities in the CT scan were deemed to be minimal and there was no justification for a mediastinoscopy or biopsy. The chronic cough was addressed. He recommended Flonase or Rhinocort for the chronic cough. (It should be noted that from September 16, 2003, through today, Lockett has been on Flunisolide.) It was also recommended that medications be continued for GERD (gastric esophageal reflux disease), with an anti-flux diet. A recommendation was made for a follow up within three months following a CT scan.

25. On March 8, 2004, Lockett had an extensive consultation at FMC Devens with our staff dietician in reference to his moderate obesity. The dietician continues to follow up and monitor this condition.

26. On April 8, 2004, he went to UMASS Radiology for another follow up CT scan of his chest. A spiral CT scan was completed on this date. Results indicated a slight increase in right lower lung ground-glass opacification and no change in the node size.

27. On April 20, 2004, Lockett went for a Pulmonary follow up with the pulmonologist at UMASS. The pulmonologist was not clear on ideology of the cough, but had recommended considering dialysis to dialyze the patient to a dryer weight and recommended a repeat CT scan in three months.

28. Lockett had been prescribed several antihistamines for chronic cough, including a trial of a cough suppressant, Tessilan Pearls, which was prescribed on May 6, 2004, which produced varying results.

29. On May 19, 2004, Lockett went to UMASS to meet with the transplant team for his initial

pre-kidney transplantation evaluation. Their recommendation was that he appeared to be a good candidate. He received counseling by the medical staff in reference to the risks and benefits fo transplantation. A continuation of his renal transplantation was scheduled for September 22, 2004.

30. On June 15, 2004, Lockett went to UMASS for a follow up with the Ear Nose and Throat (ENT) Specialist. This consultation was requested because of chronic phlegm production and cough. FMC Devens requested that the consultant consider whether there was an indication for a direct laryngoscope to visualize his vocal cords. His examination revealed again, normal phayrgael, laryngael, and hypophayrgael. His impression was complaint of phlegm with normal head and neck examination. There was no follow up recommendation.

31. On July 12, 2004, Lockett went to see UMASS Radiology for another follow up CT scan of his chest. Findings indicated no change in the results.

32. On July 20, 2004, Lockett was referred to the UMASS thoracic surgeon for follow up from the February 10, 2004 evaluation and subsequent April CT scan. He again noted that the physical examination was normal, the lungs were clear, there was no respiratory distress, and that there was no change in the node size. Some mild increase in the ground glass lung opacification was noted. Lockett reported to the pulmonologist that although his cough did persist, it has been markedly lessened with an over-the-counter anti-tussive medication. A recommendation was made for a one year follow up CT scan.

33. On August 2, 2004, blood was drawn from Lockett for tissue typing at the request of the UMASS Transplant Team.

34. On September 22, 2004, Lockett returned to the UMASS Transplant Team for his continued renal transplant evaluation. This evaluation was done by a Transplant Team Physician who completed a history and physical examination. The physician reviewed his laboratory work performed by FMC Devens. The Transplant Team physician's assessment was chronic renal failure. It was noted that Lockett appeared to be well maintained from a chemical and volume perspective with his current dialysis regimen. A renal transplant was recommended, but first he needed to undergo a cardiac evaluation, including a Persantine-Thallium or exercise treadmill test prior to clearing him for a transplant. The Transplant Team continued to pursue living donors. A follow up visit was set for approximately nine months from that date of the September, 2004 visit.

35. On October 6, 2004, Inmate Lockett went to a UMASS for a pulmonary clinic follow up. There, a pulmonary function test was completed. Results showed findings within normal limits. Specifically, it was noted that there was no ventilatory defect demonstrated by spirometry lung volumes and these findings were normal. Tests also revealed normal bronchial responsiveness and argued against a diagnosis of asthma. The pulmonary

function showed that there was no disease disfunction of his lungs. The pulmonologist now felt that the fluid balance had improved. He also requested a repeat CT scan in approximately one month.

36. On November 10, 2004, Inmate Lockett had the cardiac Persantine-Thallium exercise stress test referenced above in paragraph 34, which had been requested by the UMASS Transplant physician on September 24, 2004.

37. In closing, Lockett began receiving dialysis treatments in July 1993. As of this date, he is in stable condition and his hemodialysis site is in good condition. He receives hemodialysis (a machine with blood exchange through a fistula, through a shunt in the vein) three times a week, and is regularly seen by a contract nephrologist. As of August of 2004, he now receives, and will continue to receive, monthly tissue typing. This is a required procedure ordered by the UMASS Transplant Team prior to any transplantation. In my opinion, Lockett has been receiving fully appropriate medical care while here at FMC Devens. While the BOP is making every effort to aid him in obtaining a kidney transplant, it must ensure that all other medical issues are stable and will not interfere or present any complications with the procedure. FMC Devens and the BOP have continued to optimize his dialysis regime, and continue to pursue his renal transplant. Every consultation or procedure requested by or through UMASS, or FMC Devens' contract consultant specialists, was completed in a timely manner consistent with our on-going effort to achieve a renal transplant for Inmate Lockett. However, the final decision for organ transplantation rests with the Transplant Team at UMASS Hospital, not the BOP.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Executed this 23rd day of November.

Sandra Howard, M.D.
Clinical Director
Federal Medical Center
Devens, Massachusetts